**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**EASTERN DIVISION**
**Case No. 4:21-CV-112-FL**

| | |
|---|---|
| **BILLY SPEIGHT, Individually and on behalf of all others similarly situated,** | § <br> § <br> § |
| *Plaintiff*, | § <br> § |
| **v.** | § <br> § |
| **LABOR SOURCE, LLC,** | § <br> § |
| *Defendant*. | § <br> § |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Plaintiff Billy Speight and Opt-in Plaintiff Jerry Gardner on behalf of themselves and all others similarly situated, hereby file this Memorandum of Law in support of Plaintiff's Motion for Class Certification.

## I.       INTRODUCTION

Plaintiff Billy Speight and Opt-In Plaintiff Jerry Gardner (collectively "Plaintiffs") seek to certify the claims of the following North Carolina Class:

> **All current and former hourly, non-exempt employees, including but not limited to, Laborers, non-exempt Crew Leads, non-commercial drivers, technicians, carpenters, apprentices, cleaning crew, plumbers, welders, and other Laborers with similar job duties employed by Defendant within the State of North Carolina at any time from August 12, 2019 through the present.**

And Opt-In Plaintiff Gardner also seeks to certify the following Sub-Class of Crew Leads:[1]

> **Any Class Member who was designated as or performed the duties of a Crew Lead.**

Plaintiffs and the proposed Class Members (also referred to as "Laborers") worked as manual laborers for Defendant Labor Source, LLC's ("Labor Source") clients. Labor Source is a staffing agency for manual workers, that contracts with its clients to provide staffing for mostly repair and remediation projects. During the course of their employment, Plaintiffs and the Class Members were subjected to Labor Source's flagrant and blatant violations of federal and North Carolina labor laws. Plaintiffs contend that as a result of Labor Source's common policies and practices it failed to pay Plaintiffs and the Class Members proper minimum wages and overtime wages under North Carolina law.

The claims arising from Labor Source's conduct are perfectly suited for class-wide adjudication because the claims of the Class Members are premised on common factual and legal issues. Labor Source implemented and maintained the following common statewide policies and practices.

First, the failure to pay proper minimum wage and overtime wages resulted from Labor Source's policies and practices of not compensating Laborers for: (1) time spent during the initial on-boarding and orientation, (2) time spent traveling to and from out of town work sites, (3) time spent traveling to and from the hotel and the job site, and (4) time spent pre-shift at the work site preparing to work.

Second, the failure to properly pay minimum and overtime wages resulted from Labor Source's common practice of underreporting Class Members' hours worked at the jobsite.

---

[1] Plaintiff will seek leave to file an amended complaint to add Opt-In Plaintiff Gardner as a named plaintiff, to add the sub-class of crew leads, as well as to potentially add various Labor Source clients for which the Laborers performed work in the state of North Carolina.

Third, Labor Source makes improper deductions and/or fails to reimburse Class Members for transportation and lodging, which results in the final paid wages falling short of the required minimum and overtime wages.

Finally, for the Crew Leads Sub-Class, Labor Source failed to compensate Crew Leads for the time spent managing the crews, including checking the crews in and out of hotels, organizing the crews each day for departure from the hotel, organizing and setting up the crew at the job site before scheduled work begins, reporting to Labor Source the events of each day's work and submitting various administrative paperwork to Labor Source.

An answer as to whether any of these common policies and practices creates liability under North Carolina law for one Class Member will similarly apply to all others, thereby obviating the need for any individualized inquiries on liability questions and making this matter ideal for class treatment.

## II.  FACTUAL BACKGROUND

### A.  Class Members Share Common Job Duties and Responsibilities.

While the specific work performed by Plaintiffs and the putative Class Members vary, they are all hired to perform manual general labor work for Labor Source's clients.[2] All Laborers recruited by Labor Source have the same job duties: they are all expected to perform unskilled general labor.[3] Laborers are subjected to the same pay policies and practices and are generally paid the same hourly rates (other than Crew Leads and drivers).[4] Furthermore, Labor Source uses the same contract, the "Terms of Employment (Out of Town)" for all projects.[5]

---

[2] Reese Depo. p. 19:14-20:2.
[3] Reese Depo. p. 22:4-14.
[4] Reese Depo. p. 134: 7-10.
[5] Squires Depo. p. 37:17-21 and Ex. 2.

In addition, some Laborers are selected to be "drivers."[6] These individuals are responsible for driving the work crews from the local Labor Source office to the location of the worksite, as well as driving the crews from the hotel to the actual jobsite.[7] Drivers are paid $1-$2 more per hour than Laborers and are supposed to receive pay for all hours they drive regardless of whether it is during business hours or not.[8] Finally, some Laborers, who again, also perform the same general labor as all other Laborers, are also designated as crew "Leads." These are Laborers who "organize" the work crew on Labor Source's behalf.[9] These individuals have no supervisory control over the Laborers, but instead they have additional administrative tasks such as making sure crew members check in and out of their hotel, making sure the crew is ready to leave to the worksite each day, reporting any injuries, issues, and collecting and submitting timesheet information to Labor Source.[10]

### B.    Class Members Are Subjected to the Same Time and Pay Policies.

#### 1.    All Class Members are Subject to the Same Policies Denying Them Their Full Wages for Time Spent in Training and Travel to the Work Location.

Once a Laborer contacts Labor Source concerning potential work, they fill out a job application.  When an assignment becomes available Labor Source contacts the employee who, upon arrival at their local Labor Source office, is presented with the "Terms of Employment (Out of Town)" agreement, as well various policies such as lodging and transportation for the Laborers review.[11] When Laborers are presented with the employment agreement, various portions such as the laborer's hourly rate or travel rate are left blank.[12] Labor Source fills in those rates at a later

---

[6] Reese Depo. p. 125:23-126:2.
[7] Reese Depo. *Id.*
[8] Reese Depo. p. 120:23-121:6.
[9] Reese Depo. p. 25:12-15.
[10] Reese Depo. p. 25:19-26:5.
[11] Squires Depo. p. 35:16-36:2.
[12] Reese Depo. p. 98:7-12.

time based on the rates negotiated with the client.[13] Further, the employment agreement does not contain any mention of any overtime, meal break, or time tracking policies applicable to the Laborers.[14]

Before departing from the local office to the location of the job, the Crew Lead reviews Labor Source's "house rules" with all Laborers.[15] Labor Source also reviews the terms of the employment agreement and their expected behavior and safety concerns with all Laborers at this time as well.[16] However, as testified to by Labor Source's Person Most Knowledge and Chief Operator Officer, Robert Reese, Labor Source does not track this time or compensate Laborers for time spent working during this orientation session stating that "if it were happening prior to dispatch…I don't think they would be paid."[17]

After the orientation session the Laborers are dispatched to the work location. Per Labor Source policy, Laborers are paid for the travel time from the dispatch office to the work location, only if that travel occurred between the hours of 7am to 5pm, and any such travel time was capped at 10 hours.[18] Yet, Labor Source regularly dispatched crews for travel outside these designated hours resulting in unpaid travel time.[19]

Once at the location of their hotel, which was often an hour or more away from the job site, it was Labor Source policy that Laborers were not to be compensated for any time spent travelling between their hotel and the jobsite. Mr. Reese confirmed that Laborers "certainly are not paid for the time spent travelling from the hotel to the worksite and from the worksite to the hotel." [20] Mr.

---

[13] Squires Depo. p. 39:6-22.
[14] Reese Depo. p. 98:19-99:9.
[15] Reese Depo. p. 101:25-102:15.
[16] Reese Depo. p. 102:21-103:4.
[17] Reese Depo. P. 103:11-24.
[18] Squires Depo. p. 14:18- 15:20.
[19] Squires Depo. p. 19:19- 20:3.
[20] Reese Depo. p. 127:18- 22.

Reese also confirmed that Laborers would not be compensated for time spent meeting with a Crew Lead at the hotel to discuss the day's work because they were instructed not to "turn in" that time.[21]

### 2. All Laborers are Subject to the Same Timekeeping Policies and Practices That Work to Reduce and Inaccurately Record Their Hours Worked.

Each day, prior to beginning their work all Laborers are expected to arrive to the worksite approximately fifteen minutes before the scheduled start time.[22] During this time, the Crew Leads meet with client representatives to discuss the day's work and the Laborers prepare for the day's work.[23] However, despite this requirement, Labor Source's Executive Vice President testified that if a crew arrived at a jobsite, as required, at 7:45 a.m. for an 8:00 a.m. shift, Labor Source would still only compensate the Laborers for time starting at 8:00 a.m.[24]

As admitted by Mr. Reese, Labor Source has "no way of knowing" whether any of the information on the time sheets is accurate because Labor Source has "no corporate representative no staff employee on site.[25] That is, Labor Source does not manage, supervise, or oversee the work that their employees perform, but instead Labor Source's clients "set the daily work schedule," "assigned the laborers to their work assignments each day," and "told them what type of work to perform."[26] Further, per the testimony of Mr. Reese, the Client is to provide any tools the laborers may need.[27] Moreover, the Clients can also terminate any employee at the Client's discretion.[28]

One of the duties assigned to Crew Leads is to "record" the hours worked by Plaintiffs and putative class members on behalf of Labor Source using a daily time sheet. The time sheet is filled

---

[21] Reese Depo. p. 127:23-128:4.
[22] Squires Depo. p. 30:22- 31:9.
[23] See Gardner Decl. ¶8; Brooks Decl. ¶8; Owens Decl. ¶11; Flanagan Decl. ¶8.
[24] Toth Depo. p. 37:14-22.
[25] Reese Depo. p. 68:20-25.
[26] Reese Depo. p. 20:3-21.
[27] Reese Depo. p. 84:12-21.
[28] Reese Depo. p. 134:16-135:2.

out by the Crew Lead listing the name and ostensible time worked for each Laborer.[29] Labor Source's client is then required to review the times listed to confirm that they are "correct."[30]

However, the time-sheets are usually not "accurate" and instead underreport the true hours worked by the Laborers.[31] The time sheets are typically pre-filled, before work concludes, with the same clock-in and clock-time recorded for all workers regardless of the time actually worked.[32]

Crew Leads are instructed to list only the "scheduled" not actual start and end times. If there is a discrepancy between the time noted by the Crew Lead and the client, the Crew Lead was to match the time of the Client even if it meant inaccurately recording the hours worked.[33] Laborers are told to just sign the time sheets, otherwise they might be left off the time sheets altogether and Labor Source would not pay them for the day.[34] In other words, the workers were given the choice to sign the inaccurate time sheet and get paid for less hours than they actually worked, or the workers could refuse to sign and not get paid at all for a full day's work.

Per Labor Source policy the clock-in time reported on the time sheet was the time that the Laborers should have started performing their construction tasks.[35] Therefore, they necessarily did not capture time spent by Laborers setting up equipment and tools, donning PPE and/or

---

[29] Squires Depo. p. 23:19-25.
[30] Reese Depo. p. 55:3-17.
[31] See Speight Decl. ¶6-8; Maye Decl. ¶7-8; Gardner Decl. ¶11-12, 15; Brooks Decl. ¶16; Owens Decl. ¶14; Owens Decl. ¶12; Flanagan Decl. ¶14; M. Hinjosa Decl. ¶11-12, 16; Hagens Decl. ¶13-14; Responses to Interrogatory No. 4 by Opt-in Plaintiffs Flores, Hypolite, Flanagan; and Responses to Interrogatory No. 2 by Opt-in Plaintiffs Achane, Herring, Anderson, Brooks, Cruz Jr.,Trotter, Glynn, Robinson, Whittaker, Flores, Brown, Winn, Turner, M. Hinojosa, Davis-Fuller; Griffin, Graza, Flanagan, De Los Santos, Blue, Bella IV, Owens, Hagens, Gardner, Whitehead; Lunsford; Flores.
[32] See Speight Decl. ¶6; Maye Decl. ¶7; Gardner Decl. ¶11; Brooks Decl. ¶12; Brooks Decl. ¶16; Owens Decl. ¶12; Owens Decl. ¶12; Flanagan Decl. ¶12; Responses to Interrogatory No. 4 by Opt-in Plaintiffs Powell-Alston, Revels, Anderson, Brooks, Espinosa; Battle, Trotter, Manley, Glynn, McAllister; Robinson, Winn, Davis-Fuller, Hypolite, De Los Santos, Blue, Bella IV, Gardner.
[33] Gardner Decl. ¶15; Brooks Decl. ¶16; Owens Decl. ¶17; Hagens Decl. ¶117;  Response to Interrogatory No. 4 by Opt-in Plaintiff Hypolite.
[34] Speight Decl. ¶6; Brooks Decl. ¶12; Owens Decl. ¶12; Flanagan Decl. ¶12; Hagens Decl. ¶13-14
[35] Squires Depo. p. 30:9-15.

communicating with the Client representatives who are their supervisors at the site.[36] For example, Mr. Reese testified that because it does not track the time that Laborers spend donning PPE or conducting morning meetings to discuss the scope of work, Labor Source has no way of knowing how much time Laborers spend engaged in such tasks.

Labor Source has no way of knowing whether the hours reported on the time sheets are accurate.[37] Instead, Labor Source simply accepts these inaccurate and/or under-reported time sheets at face value despite complaints from putative class members.[38] Labor Source then relies on these inaccurate time sheets to issue wage payments to the workers, necessarily depriving them of their due wages.[39]

Labor Source goes further to assist in covering up the wage violations by failing and refusing to provide these workers ready access to itemized wage statements that would inform the workers of the total hours recorded and paid. Labor Source does not mail the earnings statements to the Laborers.[40] Instead, Labor Source purports to make the earnings statements "available" to laborer through an online portal requiring specialized software, or the employees can request it to be sent to a local Labor Source office.[41] However, in the event that there is no local office near an employee, Labor Source has no policy for providing an earnings statement to a laborer. In fact, Mr. Reese testified that he "did not know" how an employee could receive a physical copy of their earnings statement if there was no local office near them.[42] Notably, Labor Source closed its only

---

[36] See Brooks Decl. ¶11; Owens Decl. ¶11; Flanagan Decl. ¶11.
[37] Reese Depo. p. 67:6-68:25.
[38] Reese Depo. p. 67:16-68:1; see also Speight Decl. ¶11; Maye Decl. ¶14; Gardner Decl. ¶17; Brooks Decl. ¶21; Owens Decl. ¶21 Flanagan Decl. ¶21; M. Hinjosa Decl. ¶11-12; Hagens Decl. ¶22; Responses to Interrogatory No. 2 by Opt-in Plaintiffs Achane, Herring, Anderson, Brooks, Cruz Jr.; Trotter; Glynn, Robinson, Whittaker, Flores, Brown, Turner, Griffin, Graza, Flanagan, De Los Santos, Blue, Bella IV, Owens, Hagens, Gardner, Lunsford; Flores and Response to Interrogatory No. 4 by Opt-in Plaintiff Whitehead.
[39] Toth Depo. p. 35:20-36:4.
[40] Reese Depo. p. 92:18- 93:12.
[41] Id.
[42] Id.

North Carolina office in Goldsboro in 2020 or 2021.[43] Furthermore, even when Laborers have attempted to request their earnings statements those requests were ignored by Labor Source.[44]

### 3. Labor Source Maintains a Uniform Practice of Improper Deductions and Failure to Reimburse Laborers for Necessary Business Expenses Resulting in Minimum Wage and Overtime Violations.

Labor Source requires Plaintiffs and the putative Class Members to incur numerous work-related expenses and/or improperly deducts amounts from their wages for its own benefit.

With respect to travel, Labor Source deducts $7.00 per day from each laborer as a "transportation fee" despite requiring workers to staff out-of-town assignments, and giving Laborers no option but to use Labor Source transportation to get to the jobsite.[45] On top of this, Labor Source may charge any laborer up to $25 per day for "lodging" for any day that an employee is unable to perform work. This fee is charged irrespective of the actual cost to Labor Source nor the reason for an employee's inability to work, such as illness or injury.[46]

Finally, ostensibly, Labor Source communicates to Laborers and drivers that Labor Source will pay for all gas and toll expenses.[47] Labor Source was to provide "gas cards" to drivers that was to cover gas and toll expenses for the duration of a project.[48] However, the funds on these cards were typically insufficient, and as a result drivers either have to pay for gas out-of-pocket and/or collect funds from other Laborers to cover these expenses.[49] Labor Source claims that employees can submit receipts for reimbursement.[50] Yet, when Laborers do attempt to submit such

---

[43] Toth Depo. p. 17:14-20.
[44] Brooks Decl. ¶19; Hagens Decl. ¶21.
[45] Squires Depo. Ex. 2.
[46] Toth Depo. p. 33:24- 34:12.
[47] Reese Depo. p. 122:1-23.
[48] Squires Depo. p. 16:8-9.
[49] Speight Decl. ¶14; Brooks Decl. ¶16; Owens Decl. ¶18; Flanagan Decl. ¶15-17; Responses to Interrogatory No. 2 by Opt-in Plaintiffs Flores, Byrd, Williams, and Responses to Interrogatory No. 5 by Opt-in Plaintiffs, Revels, Brooks; Trotter; Manley, Whittaker, Flores, Byrd, Winn, Turner, Davis-Fuller, Hypolite, Arevalo, Williams; Flanagan, Bella IV, Owens, and Whitehead.
[50] Reese Depo. p. 122:10-19.

receipts, those reimbursement requests are ignored.[51]

### C. All Crew Leads Are Subject to the Same Policies that Unlawfully Do Not Track or Compensate Crew Leads for Administrative Work for Labor Source.

The Laborers assigned by Labor Source to a job site are organized by a laborer designated as a Crew "Lead."[52] This individual does not have any supervisory control over the crew members, but instead performs various administrative tasks for Labor Source and acts as the liaison between Labor Source and the crew. Crew Leads perform tasks such as checking the crew members in and out of the hotel, reporting any injuries or illness, organizing the crew to leave for the site each day, and communicating with Labor Source.[53] At the end of each week, the Crew Leads complete, compile and submit a weekly "time packet" to Labor Source containing various time tracking records to Labor Source.[54] Labor Source requires that Crew Leads use their own personal devices and e-mail addresses to submit these time packets.[55] Finally, at the end of each workday, the Crew Leads are required to conduct an end-of-day call with Labor Source after their workday was complete to discuss the day's events.[56]

Labor Source does not track the time Leads spend performing these tasks and therefore does not compensate them for performing these tasks. In fact, Mr. Reese admitted that he did not know how a Crew Lead could get compensated under Labor Source policy for performing these tasks unless they were performed during the crew's scheduled work time.[57] However, as noted above, Crew Leads must perform all the same manual labor duties as other Laborers, and thus, by

---

[51] Brooks Decl. ¶16; Owens Decl. ¶18; Flanagan Decl. ¶15-17; Responses to Interrogatory No. 2 by Opt-in Plaintiffs Flores, Williams and Responses to Interrogatory No. 5 by Opt-in Plaintiffs, Revels, Brooks, Manley, Whittaker, Flores, Winn, Turner, Hypolite, Arevalo, Williams, Flanagan, Bella IV, and Owens.
[52] Reese Depo. p. 25:12-15.
[53] Reese Depo. p. 25:19-26:5.
[54] Reese Depo. p. 58:1-8.
[55] Reese Depo. p. 59:7-22.
[56] Radford Depo. p. 23:11-24:6.
[57] Reese Depo. p. 26-27:16.

necessity would have to perform all of their administrative tasks "off the clock" since any time on the clock has to be spent perform manual labor for the clients.

## III.      ARGUMENTS AND AUTHORITIES

Plaintiffs seeking class certification "must affirmatively demonstrate [their] compliance" with Federal Rule of Civil Procedure 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011). Rule 23(a) requires that a prospective class satisfy four prerequisites to ensure that the class claims are fairly encompassed by those of the named plaintiff. *See* Fed. R. Civ. P. 23(a). These prerequisites are often referred to as numerosity, commonality, typicality, and adequacy. *See Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654 (4th Cir. 2019). The Fourth Circuit has also recognized that Rule 23 "contains an implicit threshold requirement" of "ascertainability" - that the members of a proposed class be "readily identifiable" by way of reference to objective criteria. *See id.* at 654-55. If these initial requirements are met, the plaintiffs must then demonstrate that the proposed class fits within at least one of the three types of classes outlined in Rule 23(b). *Id.* at 655.

Although it is Plaintiffs' burden to demonstrate compliance with Rule 23, the Court "has an independent obligation to perform a 'rigorous analysis' to ensure that all of the prerequisites have been satisfied." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (quoting *Dukes*, 564 U.S. at 350-51). However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466, 133 S. Ct. 1184, 185 L.Ed.2d 308 (2013).

## A.    The Proposed Classes Meet the Requirement of Rule 23(a).

### 1.    Plaintiffs Satisfy the Numerosity and Ascertainably Requirements.

Defendant identified approximately 2,167 hourly, non-exempt manual Laborers in the proposed classes as of September 2, 2022.[58] This easily satisfies numerosity under Fed. R. Civ. P. 23 (a)(1). While a particular number is not necessary, classes with as few as eighteen members have been certified. *See McLaurin v. Prestage Foods, Inc.*, 271 F.R.D. 465, 475 (E.D.N.C. 2010) (quoting *Brady v. Thurston Motor Lines*, 726 F.2d 136, 145 (4th Cir. 1984)) ("No specified number is needed to maintain a class action."); *Alfaro Zelaya v. A+ Tires, Brakes, Lubes, & Mufflers, Inc.*, No. 5:13-CV-810-F, 2015 U.S. Dist. LEXIS 130225, at *11 (E.D.N.C. Sep. 28, 2015)(finding numerosity met with a class of 200 individuals). "Practicability of joinder depends on various factors, such as 'the size of the class, ease of identifying its members and determining their addresses, facility of making service on them if joined and their geographic dispersion.'" *Tatum v. R.J. Reynolds Tobacco Co.*, 254 F.R.D. 59, 63 (M.D.N.C. 2008)(citing to *Baltimore v. Laborers' Int'l Union of N. Am.,* No. 93-1810, 1995 U.S. App. LEXIS 27703, 1995 WL 578084, at *1 (4th Cir. Oct. 2, 1995)). The 2,167 manual Laborers that Defendant has identified come from all over the country and they have performed work for Labor Source and its clients in North Carolina. It would be both impracticable and nearly impossible to join all of the individual members.

As in other employment class actions, the class members are ascertainable and readily identifiable through Labor Source's records. *See Rehberg v. Flowers Baking Co. of Jamestown, LLC*, No. 3:12-cv-00596-MOC-DSC, 2015 U.S. Dist. LEXIS 36929, at *10 (W.D.N.C. Mar. 23, 2015)(finding the proposed class to be ascertainable as the identities of class members could be

---

[58] Zinovyev Decl. ¶ 5.

readily determined from defendants' business records and that it met the numerosity requirement as the proposed class contained 100 distributors, making it "impracticable to bring all class members before the court on an individual basis"); *Scott v. Family Dollar Stores, Inc.*, No. 3:08-cv-00540-MOC-DSC, 2016 U.S. Dist. LEXIS 105267, at *15 (W.D.N.C. June 24, 2016)(finding the proposed class was ascertainable from defendants' business records and that it met the numerosity requirement). Further, this Court already approved an FLSA collective completely encompassing the proposed Class, and these workers have already been identified and sent notice the FLSA claims.[59]

With respect to crew Leads, as noted above, each work crew was organized by a Crew Lead, who was responsible for filling out the timesheet for each crew. A review of the documents produced to date in this action has identified the existence of at least 95 crews that performed work for Labor Source and its clients.[60] The Crew Leads is listed first on the timesheet.[61] Further, a crew Leads also receives a rate of pay that is several dollars higher than a regular general laborer, and can be identified from Labor Source's invoices as well. Accordingly, the identities of each crew Leads can be readily ascertained. Thus, the proposed subclass of Crew Leads also satisfies the requirements of Rule 23.

### 2. Plaintiff Satisfies Commonality and Typicality Under Rule 23(a)(2) and (3).[62]

Commonality under Fed. R. Civ. P. 23(a)(2) requires that there be "questions of law or fact common to the class." This requires Plaintiff to show that a class wide proceeding can "generate

---

[59] See Dkt. 39.
[60] Zinovyev Decl., ¶8.
[61] Squires Depo. p. 24:13-16.
[62] In this Circuit, commonality and typicality generally merge into a single inquiry. *See Stott v. Haworth*, 916 F.2d 134, 143 (4th Cir. 1990); *Roldan v. Bland Landscaping Co.*, 341 F.R.D. 23, 33 (W.D.N.C. 2022). Thus, the same reasons as to why there is commonality will support (or counsel against) a finding of "typicality." *Id.* Simply put, both requirements determine whether the claims of the named plaintiffs and the class "are so interrelated that the interests of the class members will be fairly and adequately protected." *See id.* (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)).

common answers apt to drive the resolution of the litigation." *See Dukes,* 564 U.S. 338, 350. Commonality is easily met as it is a "low hurdle easily surmounted." *Olvera-Morales v. Int'l Labor Mgmt. Corp.*, 246 F.R.D. 250, 252 (M.D.N.C. 2007) Under the "commonality" requirements of Rule 23(a)(2), at least one common question of law or fact must exist among class members. and there is no requirement that all, or even most, issues be common. *Sanchez-Rodriguez v. Jackson's Farming Co.*, No. 7:16-CV-28-D, 2017 U.S. Dist. LEXIS 11215, at *6 (E.D.N.C. Jan. 27, 2017); *Olvera-Morales*, 246 F.R.D. at 252.

While typicality under Fed. R. Civ. P. 23(a)(3) requires a showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class", typicality does not require that the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned-some minor variation between a named plaintiff's individual claim and those of the class members he aims to represent is to be expected. Rather, the representative's claims must only have the same essential characteristics as the claims of the class at large. *Roldan v. Bland Landscaping Co.*, 341 F.R.D. 23, 28 (W.D.N.C. 2022). Typicality ensures that a representative "possess[es] the same interest and suffer[s] the same injury as the class members." *Gen. Tel. Co. of the SW v. Falcon*, 457 U.S. 147, 156, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982).

The commonality and typicality requirements may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of the other class members. *Romero v. Mountaire Farms, Inc.*, 796 F. Supp. 2d 700, 714 (E.D.N.C. 2011).

In *Zelaya*, the Court considered the class certification motion of an employee who performed various car repair services for defendants for claims of unpaid wage, overtime and failure to reimburse expenses. *Alfaro Zelaya v. A+ Tires, Brakes, Lubes, & Mufflers, Inc.*, No. 5:13-CV-810-F, 2015 U.S. Dist. LEXIS 130225, at *2-5 (E.D.N.C. Sep. 28, 2015). Just as in this

case, the plaintiff and class members' claims were premised on unpaid time spent performing work before or after the Laborers' scheduled shift as well as travel time to job sites. *Id.* Further, and again similar to this case, Laborers were instructed to either report less hours than they actually worked, or had their recorded hours reduced by their supervisors. *Id.* The Laborers also brought a claim for a failure to reimburse for expenses incurred during work that they were promised reimbursement for. *Id.*

In granting class certification, Judge Fox found that Plaintiff met the requirements for commonality and typicality, in particular noting that "*allegations* of similar employment practices alone are sufficient to satisfy the commonality and typicality requirements." *Id.* at 11 [emphasis in original]. Judge Fox further found the requirements of commonality and typicality were met when the class members submissions showed several common policies and practices that affect them, such as having their hours reduced, not having their expenses reimbursed and not recording their travel time. *Id.* at 11-12.

In this case, similar to *Zelaya,* the allegations and evidence show that this case is proper for class treatment. Specifically, the claims of the Class and Sub-Class Members turn not on individualized inquiries but on common questions of law and fact that can be answered for all Class Members and Sub-Class Members in a single stroke. The common questions in this case include but are not limited to:

- Whether time spent during training and orientation is compensable;

- Whether time spent traveling to the work site is compensable;

- Whether time spent traveling between the hotel and the job site is compensable;

- Whether pre-shift time spent preparing to work is compensable;

- Whether Labor Source has a policy and practice of underreporting Laborers' time

worked;

- Whether Labor Source has a policy and practice of refusing to reimburse necessarily incurred business expenses;

- Whether Labor Source has a policy and practice of improperly deducting transportation and lodging fees from Laborers' wages; and

    Whether time spent by Crew Leads performing administrative tasks outside of scheduled work hours is compensable.

Because it is plain that this class wide proceeding can "generate common answers apt to drive the resolution of the litigation[,]" *Dukes,* 564 U.S. 338, 350, Plaintiff easily satisfies the limited burden to demonstrate commonality pursuant to Rule 23(a)(2).

### 3. Plaintiffs and Class Counsel Will Adequately Represent the Class Members.

"A class action is appropriate only when both class representatives and class counsel adequately protect the interests of the class." *Bell v. Brockett*, 922 F.3d 502, 510 (4th Cir. 2019). Adequacy of representation requires that the class representative plaintiff not have interests which are materially adverse to the class. *Grabarczyk v. Stein*, No. 5:19-CV-48-BO, 2019 U.S. Dist. LEXIS 159365, at *6 (E.D.N.C. Sep. 18, 2019). There are two basic guidelines that frame the Court's review of the adequacy of representation requirement. They are 1) the absence of conflict between the representative and members of the class and 2) the assurance that the representative will vigorously prosecute the matter on behalf of the class. *Stay the Course W. Va. v. Tennant*, No. 1:12-cv-01658, 2013 U.S. Dist. LEXIS 6998, at *7-8 (S.D. W. Va. Jan. 17, 2013); *see also Sharp Farms v. Speaks*, 917 F.3d 276, 295 (4th Cir. 2019) (class representatives must fairly and adequately protect interests of class). The adequacy of representation factor tends to overlap with the typicality and commonality requirements. *Grabarczyk*, 2019 U.S. Dist. LEXIS 159365, at *6

(citing to *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006)).

Here, there is no potential conflict between Plaintiffs and the Class Members or Sub-Class members. As outlined above, the proposed class representatives shares common claims and interests with the Class and Sub-Class, Plaintiffs and the Class and Sub-Class members all seek the payment of their full due wages and recovery of necessary business expenses. The Sub-Class of Crew Leads simply seeks the recovery of wages and expenses for the additional administrative tasks they performed off-the-clock for labor source.

Further, there is no evidence that the class representatives have any conflict that would prevent them from vigorously prosecuting the case in the best interest of the Class.[63] To date, Plaintiffs have shown that they will vigorously prosecute the case by actively participating in the case, including by appearing for deposition[64], participating in discovery, and submitting sworn declarations to the Court.[65]

With respect to adequacy of Counsel Rule 23(g) requires court to consider: "(1) the work counsel has done in identifying or investigating potential claims in the action (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law and (4) the resources that counsel will commit to representing the class." *Speaks v. United States Tobacco Coop., Inc.*, 324 F.R.D. 112, 139 (E.D.N.C. 2018). Plaintiffs' counsel has years of experience litigating wage and hour class actions.[66] Further, counsel has expended considerable efforts in discovery and outreach to identify and investigate potential claims in conjunction with applicable law.[67] Finally, as an experienced

---

[63] Speight Decl. ¶17-18.
[64] Opt-In Plaintiff Gardner is scheduled to be deposed on March 29, 2023.
[65] Cottrell Decl. ¶12
[66] Cottrell Decl. ¶¶4-6
[67] Cottrell Decl. ¶¶8-10

wage and hour class action litigation firm, Plaintiffs' counsel will be able to commit sufficient resources to representing the class.[68] Thus, counsel for Plaintiffs has the requisite competence, dedication, and experience to serve the interests of the Class Members.

**B.     The Proposed Classes Satisfy the Requirements of Rule 23(b)(3).**

Plaintiffs seek certification of the Class under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

**1.     Common Questions Predominate Over Individual Questions.**

To certify a class action under Rule 23(b)(3), "the court [must] find that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Rule 23(b)(3) predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation" and "calls upon courts to give careful scrutiny to the relation between common and individual questions in a case." *Bartels v. Saber Healthcare Grp., LLC*, No. 5:16-CV-283-BO, 2020 U.S. Dist. LEXIS 195281, at *7 (E.D.N.C. Oct. 21, 2020) *(citing to Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 136 S. Ct. 1036, 1045, 194 L. Ed. 2d 124 (2016)). The predominance inquiry focuses on the balance between individual issues and common issues. *Berber v. Hutchison Tree Serv.*, No. 5:15-CV-143-D, 2018 U.S. Dist. LEXIS 137038, at *25 (E.D.N.C. Aug. 14, 2018)); *see also, Brown v. Nucor Corp.,* 785 F.3d 895, 917-21 (4th Cir. 2015).

---

[68] Cottrell Decl. ¶11

The "predominance" and "superiority" requirements "cover cases in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 615, (1997) (ellipses in original) (internal quotation marks omitted).

Here, the legal and factual issues common to the putative class predominate over any individual issues of law or fact. Indeed, the evidence submitted by Plaintiffs in support of this motion, shows the same common fact issues—the failure of class members to have all time worked recorded or paid for, failure to compensate the Laborers for travel time, improper deductions, and nonpayment of overtime. These factual and legal issues can be effectively and uniformly adjudicated in the instant case, such that individual class members have little incentive to bring separate actions. For example, this case will turn on legal questions such as whether Labor Source's policies and their implementation concerning which time was compensated, payment for travel time, reimbursements, deductions and issuance of wage statements were in conformity with the law or not. Thus, legal questions will predominate over any individual factual inquiries, in compliance with Rule 23.

"Challenges to admittedly common policies that drive the determination of liability predominate over individual questions of adverse effect and the degree of harm." *See McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th Cir. 2012) (Posner, J.) (reasoning that despite individual issues of "which class members were actually adversely affected" by the challenged practices, such practices "present a pair of issues that can most efficiently be determined on a class-wide basis."). For instance, "[i]n wage-and-hour cases… courts have found the element of predominance satisfied where the employer is alleged to have a

'practice of denying overtime compensation in violation of applicable law… even if there are 'factual variations… that go to the measure of damages.'" *Kloppel v. HomeDeliveryLink, Inc.*, No. 17-CV-6296-FPG, 2020 U.S. Dist. LEXIS 97677, at *27 (W.D.N.Y. June 3, 2020) (Geraci, J.) (citations omitted); *see also, Kurgan v. Chiro One Wellness Ctrs. LLC,* No. 10-cv-1899, 2014 U.S. Dist. LEXIS 20255, 2014 WL 642092, at *9 (N.D. Ill. Feb. 19, 2014) (unpublished) ("Where, as here, the focus is on liability-imposing conduct of the defendant that is identical as to all putative plaintiffs, the predominance element is satisfied.").

Here, Plaintiffs' challenges to Labor Source's admittedly common policies and practices (or lack thereof) raise questions that are apt to generate common answers as to whether Labor Source has met its basic legal obligations under North Carolina wage and hour law. Determining whether Labor Source properly compensated Laborers for minimum wage and overtime for all hours worked, can be done in one fell swoop for all Laborers by assessing the following key challenged policies and practices 1) Not compensating Laborers for on-boarding and orientation; 2) Labor Source's policy of not compensating Laborers for all travel time to the work location; 3) Labor Source's policy of not compensating Laborers for all travel time between the worksite and their hotel; 4) Labor Source's policies or practice of underreporting all hours worked; 5) Labor Source not paying crew Leads for time spent performing administrative task; 6) Labor Source's policy of charging improper deductions for travel and lodging expenses; 7) Labor Source's policy of having crew time sheets filled out ahead of time with sets times and requiring Laborers to sign off on the time sheets without being able to review their time; 8) Labor Source's policy of having no supervisors on site during work and permitting the laborers to be directed and supervised by Labor Source's clients; and 9) Labor Source's policy of not reimbursing employees for business related expenses such as gas, tolls, and cellular phone use.

These liability questions will revolve around common proof, such as the written policies, and contracts issued by Labor Source as well as the deposition testimony of Labor Source employees. This common proof establishes the existence of common and uniform timekeeping policies and practices with respect to what work and travel time is compensable and how that time is recorded, and the legality of the deductions charged by Labor Source. Further, the liability questions will also turn on the discovery responses and testimony of Class and Sub-Class members showing class-wide and Sub-Class-wide practices by Labor Source and its clients of failing to compensate class members for all hours worked, including overtime, failure to reimburse necessary expenses, and making improper deductions and charges to Laborers.

Questions of damages, to the extent they are individualized, do not undermine a finding that common questions predominate. *See, e.g., Brown v. Electrolux Home Prods., Inc.,* 817 F.3d 1225, 1232, 1239 (11th Cir. 2016); *Hart v. Louisiana-Pac. Corp.,* No. 2:08-CV-47-BO, 2013 U.S. Dist. LEXIS 190100, 2013 WL 12143171, at *2 (E.D.N.C. Mar. 29, 2013) (unpublished).[69] Rather, a class may be certified under Rule 23(b)(3) "even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc.,* 136 S. Ct. at 1045 (quotation omitted); *see also, Crutchfield v. Sewerage & Water Bd. of New Orleans,* 829 F.3d 370, 376 (5th Cir. 2016). Regardless of how the

---

[69] "There are a number of management tools available to a district court to address any individualized damages issues that might arise in a class action…." *In re Tri-State Crematory Litig.*, 215 F.R.D. 660, 699, n.28 (N.D. Ga. 2003) (citing *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 141 (2d Cir.2001)); *see also, Spears v. First Am. eAppraiseIT,* 2014 WL 4647679, at *21-22 (N.D. Cal. Sept. 16, 2014) (reasoning that even where damages cannot be shown by representative testimony and estimates, class members can still prove their damages individually without "numerous 'mini-trials' on specific individual class members."); *Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.,* 311 F.R.D. 590, 593 (C.D. Cal. 2015) ("If calculation of individualized damages is complex, the court has numerous efficient means to resolve such issues, including questionnaires, surveys, representative testimony, the use of a special master and other aggregate analysis.").

damages may ultimately be resolved, however, "it is well-established that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 164-65 (2d Cir. 2012). Ultimately, damages questions can be resolved through either bifurcated damages proceedings or other representative evidence.

## 2. A Class Action is Superior to the Other Available Methods for Fairly and Efficiently Adjudicating the Controversy.

Plaintiffs also satisfy each of the Rule 23(b)(3) superiority factors. "The superiority requirement ensures that 'a class action is superior to other available methods for the fair and efficient adjudication of the controversy.'" *Thorn v. Jefferson-Pilot Life Ins. Co*., 445 F.3d 311, 319 (4th Cir. 2006) (quoting Fed. R. Civ. P. 23(b)(3)). When making its determination with respect to Rule 23(b)(3), the court must consider "the class members' interests in individually controlling the prosecution or defense of separate actions; the extent and nature of any litigation concerning the controversy already begun by or against class members; the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D).

Here, Class Members lack an interest in individually controlling the prosecution of this case due to the modest damages available. While the damages available are individually significant, they are modest as compared to the time, effort, and cost associated with an individual action. As Judge Posner has observed, "[t]he *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (original emphasis)). Indeed, "[c]ases, such as this, where litigation costs dwarf potential recovery are paradigmatic examples of those well-suited for class wide prosecution." *Mullins v. Premier Nutrition Corp.*, No. 13-cv-01271-RS,

2016 U.S. Dist. LEXIS 51140 at *25 (N.D. Cal. Apr. 15, 2016). "Individual suits for small recovery amounts would overwhelm the courts and prove uneconomic for potential litigants." *Id.* at *25-26.

The class mechanism is also superior pursuant to Fed. R. Civ. P. 23(b)(3)(B) because Plaintiff is aware of no other pending North Carolina cases related to the issues in this action.[70]

Finally, for reasons detailed in the predominance section, this class action will not present any manageability concerns. A class action is a superior method for the fair and efficient adjudication of this controversy. With over 2100 members of the proposed class, individual adjudication of the legal issues would be duplicative and inefficient. *Harbourt v. PPE Casino Resorts Md., LLC,* No. CCB-14-3211, 2017 U.S. Dist. LEXIS 9229, at *17 (D. Md. Jan. 23, 2017). Thus, a class action is clearly superior to the alternatives. For these reasons, Rule 23(b)(3)'s superiority requirements are satisfied.

## IV. CONCLUSION

Plaintiffs' motion should be granted in its entirety. The claims asserted are ideally suited for class treatment as they are predicated on common factual and legal questions. All putative Class Members are subject to the same time-keeping policies with respect to how their time is tracked and paid. The Class Members are further subject to the same travel pay policies, as well as the same policies concerning transportation deductions, lodging deductions and reimbursement of expense policies. Similarly, all Crew Leads are subject to the same policies concerning the compensation or lack thereof for time spent performing various administrative duties for the benefit of Labor Source. As a result class certification is warranted because answering questions of liability for one Laborer is the same as answering for all Laborers.

---

[70] *See* Zinovyev Decl. ¶ 4.

Dated: March 20, 2023

Respectfully submitted,

SCHNEIDER WALLACE COTTRELL KONECKY LLP

*/s/ Carolyn H. Cottrell*
Carolyn H. Cottrell* (Cal. SBN 166977)
Ori Edelstein* (Cal. SBN 268145)
Eugene Zinovyev* (Cal. SBN 267245)
2000 Powell Street, Suite 1400
Emeryville, California 94608
ccottrell@schneiderwallace.com
oedelstein@schneiderwallace.com
ezinovyev@schneiderwallace.com
*Special Appearance*

/s/John J. Nestico
John J. Nestico (N.C. SBN 39457)
6000 Fairview Road, Suite 1200
Charlotte, North Carolina 28210
Tel: (510) 740-2946;
Fax:(415) 421-7105
jnestico@schneiderwallace.com

*Local Civil Rule 83.1(d) Counsel for Plaintiff*
*Counsel for Plaintiff, Class, and Class Members*

## CERTIFICATE OF CONFERENCE

I hereby certify that I have attempted to confer with known counsel for Defendant about the subject of this Motion. Defendant's known counsel indicated Defendant was opposed.

*/s/ Carolyn H. Cottrell*
Carolyn H. Cottrell* (Cal. SBN 166977)

## CERTIFICATE OF WORD COUNT

I hereby certify that Plaintiffs' Memorandum in Support of Plaintiff's Motion for Class Certification complies with Local Rule 7.2(f)(3). I further certify that, in preparation of this Memorandum, I used Microsoft Word for Microsoft 365, and that this word processing program has been applied specifically to include all text, including headings, footnotes, and quotations in the following word count. I further certify that the above-referenced Memorandum contains 7,209 words.

*/s/ Carolyn H. Cottrell*
Carolyn H. Cottrell* (Cal. SBN 166977)

## CERTIFICATE OF SERVICE

I certify that on March 20, 2023, I filed this motion through the Eastern District of North Carolina's CM/ECF system which will serve an electronic copy on all parties of record.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART P.C.
Kevin S. Joyner (N.C. Bar No. 25605)
8529 Six Forks Road, Forum IV, Suite 600
Raleigh, NC 27615
919.787.9700
919.783.9412 (Facsimile)
Email: kevin.joyner@ogletree.com

Justin M. Dean
4520 Main Street, Suite 400
Kansas City, MO 64111
816.410.2244
816.471.1303 (Facsimile)
Emails: justin.dean@ogletree.com

*Known counsel for Defendant Labor Source, LLC*

*/s/ Carolyn H. Cottrell*
Carolyn H. Cottrell* (Cal. SBN 166977)