IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:21-CV-112-FL

| | | |
|---|---|---|
| BILLY SPEIGHT, JASON HAGENS, SCOTTIE WILLIAMS, and TANGELA FLANAGAN, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | ORDER |
| LABOR SOURCE, LLC, | ) ) | |
| Defendant. | ) | |

This matter comes before the court on plaintiffs' renewed motion to certify class (DE 163). The court heard oral argument on the motion February 28, 2025. The issues raised have been briefed fully and in this posture are ripe for ruling. For the following reasons, the motion is denied.

## STATEMENT OF THE CASE

Plaintiff Billy Speight ("Speight"), a former employee of defendant, a staffing agency, commenced this action August 12, 2021, asserting collective action claims on behalf of himself and others similarly situated under the Fair Labor Standards Act, 29 U.S.C. § 203 et seq. ("FLSA"); as well as putative class action claims under the North Carolina Wage and Hour Act, N.C. Gen. Stat. § 95-250.1 et seq. ("NCWHA").

On April 14, 2022, the court dismissed that part of Speight's claims brought on behalf of employees "who did not work in North Carolina . . . or otherwise have the requisite connection to the state." (Order (DE 35) at 20). The court denied without prejudice plaintiffs' motion to certify conditionally the proposed collective action. Thereafter, however, upon the parties' stipulation,

1

the court conditionally certified an FLSA collective action comprised of "[a]ll current and former manual laborers employed by Defendant . . . on any project in North Carolina, at any time during the period from August 12, 2018 to the present."  (DE 39 at 1).

After a period of discovery, July 12, 2023, the court allowed Speight leave to amend the complaint to add new individual plaintiffs Jason Hagens ("Hagens"), Scottie Williams ("Williams"), and Tangela Flanagan ("Flanagan") (collectively, with Speight, "plaintiffs"), but denied leave to add new defendants who were alleged customers of defendant.  (See Order (DE 110) at 9).  The court also terminated as moot first motion to certify class brought by plaintiff Speight (DE 81), noting "amendment of the complaint likely will alter some of the parties' arguments in support of or opposition" thereto.  (Order (DE 110) at 12).

Plaintiffs filed the operative first amended complaint, July 19, 2023, reasserting their FLSA and NCWHA claims and seeking declaratory relief, certification of NCWHA claims as a class action, award of back pay, liquidated damages, and costs, expenses, and attorneys' fees.

Following class discovery,[1] plaintiffs filed a second motion to certify class April 10, 2024, requesting certification of the following class:

> All current and former hourly, non-exempt employees, including but not limited to, Laborers, non-exempt Crew Leads, non-commercial drivers, technicians, carpenters, apprentices, cleaning crew, plumbers, welders, and other Laborers with similar job duties employed by Defendant within the State of North Carolina during the Class Period.

(DE 133 at 1) (hereinafter the "second motion to certify class").  Plaintiffs also requested certification of a subclass consisting of "[a]ny Class Member who was designated as or performed the duties of a Crew Lead."  (Id. at 2).  In the meantime, defendant filed a motion for judgment on

---

[1]    During this time, the court also denied plaintiffs' motion for reconsideration of that part of the court's July 12, 2023, order denying leave to amend.  (Order (DE 132) at 5)

the pleadings, June 10, 2024, seeking dismissal of plaintiffs' NCWHA claims and related class allegations.

The court granted in part and denied in part defendant's motion for judgment on the pleadings, and denied plaintiffs' second motion to certify class, in order entered September 23, 2024. The court dismissed plaintiffs' minimum wage and overtime claims under the NCWHA, but allowed "that part of plaintiffs' NCWHA claim under the payday provision [to] proceed, based upon defendant's alleged failure to pay plaintiffs wages, when due, for all hours worked at their regular hourly rate (which exceeded the minimum wage rate under the FLSA)." (Order (DE 156) at 13; see Speight v. Lab. Source, LLC, No. 4:21-CV-112, 2024 WL 4267914, at *6 (E.D.N.C. Sept. 23, 2024) (hereinafter "Speight")).

In denying plaintiffs' second motion to certify class, the court held that "issues concern[ing] the temporal and geographical scope of the NCWHA claim and the limitations placed upon plaintiffs' NCWHA claim as a result of the court's ruling on defendant's motion for judgment on the pleadings . . . undercut plaintiffs' evidence concerning all the Rule 23 prerequisites, particularly commonality and typicality." (Id. at *7). In particular, the court held the class must be limited to the time period from August 12, 2019, to present, and geographically to workers who "performed labor or services within" North Carolina. (Id.). When given these limitations, plaintiffs' evidence was insufficient to meet the class certification standard, because much of it related to work prior to that time period, outside of North Carolina, or without differentiating minimum wage, overtime, or regular wages due. (See id. at *7-9).

Plaintiffs moved for reconsideration of the court's September 23, 2024, order, and in the alternative to certify a narrower proposed class, consisting of the following:

> [A]ll current and former hourly, non-exempt employees, including but not limited to, Laborers, non-exempt Crew Leads, non-commercial drivers, technicians,

carpenters, apprentices, cleaning crew, plumbers, welders, and other Laborers with similar job duties <u>who traveled to and from jobsites for Defendant's benefit</u> within the State of North Carolina at any time from August 12, 2019 through the present.

(Pls' Mem. (DE 158) at 10) (emphasis in original).

The court denied that part of the motion seeking reconsideration, and granted in part the alternative motion as follows:

> TEXT ORDER regarding plaintiffs' motion for reconsideration and alternative motion to certify narrowed proposed class DE 157. That part of the instant motion seeking reconsideration of the part of the court's September 23, 2024, order denying plaintiffs' motion to certify class is DENIED. Plaintiffs have not demonstrated the court misapplied the standard for class certification in light of the evidence presented in support of their motion to certify class. However, the court GRANTS IN PART the alternative part of plaintiffs' instant motion. The court ALLOWS plaintiffs leave to file a renewed motion to certify class, within 14 days of the date of this order, which seeks to certify the narrower proposed class as set forth in their memorandum in support of the instant motion. Consistent with the parties' joint status report DE 159 , the court HOLDS IN ABEYANCE scheduling deadlines for the remainder of the case until after adjudication of the renewed motion.

(December 2, 2024 Text Order).

Plaintiffs then filed the instant renewed motion to certify class December 16, 2024, relying upon the same evidence they promoted in support of their April 10, 2024, motion to certify class, namely: 1) declarations of counsel, all four plaintiffs, and opt-in plaintiffs Joshua Brooks ("Brooks"), Jerry Gardner ("Gardner"), Mark Hinojosa ("Hinojosa"), Nikia Maye ("Maye"), and Delbert Owens ("Owens"); 2) excerpts of depositions of defendant's employees Jennifer Squires ("Squires"), Rachel Radford ("Radford"), Archie Toth ("Toth"), and Robert Reese ("Reese"); and 3) opt-in plaintiffs' responses to defendant's interrogatories and document requests.

In the instant motion, plaintiffs seek certification of the following revised class and three subclasses:

> All current and former hourly, non-exempt employees, including but not limited to, Laborers, non-exempt Crew Leads, non-commercial drivers, technicians, carpenters, apprentices, cleaning crew, plumbers, welders, and other Laborers with

4

similar job duties who were transported by Defendant within the State of North Carolina any time from August 12, 2019 through the present.

(Pls' Mot. (DE 163) at 1) (the proposed "Class").

Any Class Member who was dispatched from North Carolina to project sites outside of North Carolina.

(Id. at 2) (the proposed "Goldsboro Subclass").[2]

Any Class Member who performed work for Defendant on projects located in the State of North Carolina during the Class Period.

(Id.) (the proposed "North Carolina Subclass").[3]

Any Class Member who was designated as or performed the duties of a Crew Lead in North Carolina.

(Pls' Mem. (DE 164) at 6) (the proposed "Crew Lead Subclass").[4]

Defendant responded in opposition, relying upon a second declaration of Reese[5] and excerpts of depositions of Squires, Radford, and Reese, as well as plaintiffs Hagens, Williams, and Flanagan. Plaintiffs replied, and the motion was submitted. On January 29, 2025, the court noticed hearing on the motion to take place February 28, 2025.

To facilitate the court's address of the motion at hearing, the court directed plaintiffs to file "a supplement to their motion listing plaintiffs' proposed class representatives." (Order (DE 169) at 1). Plaintiffs field their supplemental submission February 5, 2025, noting that their proposed

---

[2] The title "Goldsboro Subclass" does not appear in the motion itself, but it appears in plaintiffs' memorandum in support of the motion. (Pls' Mem. (DE 164) at 6).

[3] The title "North Carolina Subclass" does not appear in the motion itself, but it appears in plaintiffs' memorandum in support of the motion. (Pls' Mem. (DE 164) at 6).

[4] The motion itself does not include the Crew Lead Subclass, but repeats (apparently inadvertently) the definition of the North Carolina Subclass. (See Pls' Mot. (DE 163) at 2).

[5] In opposition to plaintiffs' second motion to certify class, defendant filed the first declaration of Reese (DE 149-1). In opposition to the instant motion, defendant has filed a second declaration of Reese at DE 167-5.

class representatives are Hagens, Williams, and Flanagan (and not plaintiff Speight). (DE 170).[6] At hearing, counsel for plaintiffs confirmed withdrawal of plaintiff Williams as a proposed class representative, insofar as there is no evidence that he worked in North Carolina during the class period. In taking the instant motion under advisement at hearing, the court directed defendant to file complete depositions of plaintiffs Hagens and Flanagan, which defendant then filed March 6, 2025.

With respect to case scheduling, the court's December 21, 2021, case management order leaves open deadlines for completion of discovery and for dispositive motions. The court's May 19, 2022, amended case management order, requires that within "14 days of the court's ruling on any motion for class certification . . . the parties shall submit further supplement to their joint report and plan that proposes limits and deadlines for merits-based discovery," and it anticipates a period of expert discovery to follow. (DE 37 at 1-2). The court held in abeyance in its December 2, 2024, order scheduling deadlines for the remainder of the case until after adjudication of the instant renewed motion.

### STATEMENT OF FACTS

The court, in its September 23, 2024, order summarizes the facts alleged in the first amended complaint and those allegations are incorporated herein by reference. See Speight, 2024 WL 4267914 at **2-4. As further background for the instant motion, factual contentions pertaining to plaintiffs' two currently proposed class representatives[7] include the following.

---

[6] The parties filed February 13, 2025, a joint motion for leave to appear remotely (DE 171), which the court denied.

[7] As noted, counsel for plaintiffs withdrew plaintiff Williams as a proposed class representative, at hearing, with the caveat being that the withdrawal was made insofar as there is no evidence he worked in North Carolina during the class period. For the sake of completeness of the record, the court hereby expressly finds that there is no evidence in the record that plaintiff Williams worked in North Carolina during the class period. Therefore, the court concludes Williams is not a suitable class representative because his claims are not typical of other class members and individual issues of liability predominate with respect to plaintiff Williams's claims. Therefore, the court addresses

6

A.      Hagens

Hagens is a resident of Goldsboro, who was employed by defendant "as a manual laborer

from approximately 2019-2021 on various projects in North Carolina."  (Hagens Decl. (DE 137)

¶ 2).  He also "worked as a crew lead during that same time period."  (Id.).  According to Hagens:

> I was recruited for jobs from Labor Source's office location in Goldsboro, North
> Carolina. Once assigned to a project, Labor Source would transport myself and
> other Laborers in passenger vans to the work site locations throughout North
> Carolina. I was not paid for my time spent travelling to the worksite location.
>
> At the end of a project, Labor Source would transport all the laborers back to the
> office from which we were recruited. Typically, it took 1 ½ to 2 hours to return
> from a project. The time spent travelling was not tracked, and I was not
> compensated for this travel time.
>
> As crew lead, I was responsible for making sure my crew was checked into the
> hotel. I also had to spend 30-60 minutes every day making sure they were all ready
> to leave on time each morning, and ready to depart each evening. I was not
> compensated for any of these activities, nor was my time spent performing these
> activities tracked.
>
> Once at the worksite location, all of the workers were required to stay at a hotel
> chosen by Labor Source. We did not have our own personal transportation and were
> required to use Labor Source vans to transport us between the jobsite and our hotel.

(Hagens Decl. (DE 137) ¶¶ 6-9).  Additional facts pertaining to plaintiff Hagens will be discussed

in the analysis herein.

B.      Flanagan

Flanagan is a resident of Goldsboro, North Carolin, who was employed by defendant "as a

manual laborer from approximately 2019 on various projects in North Carolina such as Surf City

and Turtle Cove" in Raleigh.  (Flanagan Decl. (DE 139) ¶¶ 2, 4).  Flanagan states:

> For all the projects I worked on for Labor Source in North Carolina, I was recruited
> for jobs from Labor Source's office location in Berkeley Boulevard, Goldsboro,
> North Carolina. Once assigned to a project, Labor Source would transport myself
> and other laborers in passenger vans to the work site locations throughout North

further herein the claims of neither plaintiffs Speight nor Williams.

7

Carolina. I was not paid for my time spent travelling to the worksite location. It took 2-3 hours to get to the worksite.

At the end of a project, Labor Source would transport all the laborers back to the office from which we were recruited. Typically, it took 2 to 3 hours to return from a project. The time spent travelling was not tracked and I was not compensated for this travel time.

Once at the worksite location, all the workers were required to stay at a hotel chosen by Labor Source. We did not have our own personal transportation and were required to use Labor Source vans to transport us between the jobsite and our hotel.

Every day all the laborers would meet at the hotel parking lot at around 6am in the morning. We would ride together in the vans to the worksite. It would take approximately 60 minutes to get to the worksite. While driving, we would reiterate the project we were about to do that day and the amount of time required to spend on the project.

(Flanagan Decl. (DE 139) ¶¶ 5-8). Further facts pertinent to Flanagan will be discussed in the analysis herein.

## COURT'S DISCUSSION

A.      Class Certification Standard

Federal Rule of Civil Procedure 23(a) sets forth four "prerequisites" of a class action:

(1) the class is so numerous that joinder of all members is impracticable ["numerosity"];

(2) there are questions of law or fact common to the class ["commonality"];

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ["typicality"]; and

(4) the representative parties will fairly and adequately protect the interests of the class ["adequacy"].

Fed. R. Civ. P. 23(a); see Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 349 (2011) (labeling the Rule's four requirements as "numerosity, commonality, typicality, and adequate representation").

A class action also "must fall within one of the three categories enumerated in Rule 23(b), with certification being appropriate under Rule 23(b)(3) when '(1) common questions of law or fact predominate over any questions affecting only individual class members; and (2) proceeding as a

8

class is superior to other available methods of litigation.'" Career Counseling, Inc. v. AmeriFactors Fin. Grp., LLC, 91 F.4th 202, 206 (4th Cir. 2024) (quoting Fed. R. Civ. P. 23(b)(3)).[8] "In other words, Rule 23(b)(3) requires both 'predominance' and 'superiority.'" Id.

"A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact," typicality of claims, and adequacy of representation. Wal-Mart Stores, Inc., 564 U.S. at 350. "It is the plaintiffs' burden to demonstrate compliance with Rule 23." EQT Prod. Co. v. Adair, 764 F.3d 347, 357 (4th Cir. 2014). "[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." Wal-Mart Stores, Inc., 564 U.S. at 350-351. "Rule 23 does not set forth a mere pleading standard," and "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." Id. at 350.

"[I]n a class certification analysis, the court determines whether the Rule 23 requirements have been satisfied without considering whether the proposed class is likely to prevail on the merits." Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co., 95 F.4th 181, 188 (4th Cir. 2024). At the same time, "[s]ince the requirements of Rule 23 are often enmeshed in the factual and legal issues comprising the plaintiffs' cause of action, the district court must rigorously examine the core issues of the case at the certification stage." Krakauer v. Dish Network, L.L.C., 925 F.3d 643, 654 (4th Cir. 2019). "Although Rule 23 does not give district courts a license to engage in free-ranging merits inquiries at the certification stage, a court should consider merits questions to the extent that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." EQT Prod. Co., 764 F.3d at 358.

---

[8]     Internal quotation marks and citations are omitted from citations in this order unless otherwise specified.

9

"Rule 23(b)(3)'s predominance requirement is necessarily intertwined with Rule 23(a)'s commonality requirement." Stafford v. Bojangles' Restaurants, Inc, 123 F.4th 671, 679 (4th Cir. 2024). To meet these requirements, "all class members' claims must depend upon a common contention that is capable of classwide resolution." G.T. v. Bd. of Educ. of Cnty. of Kanawha, 117 F.4th 193, 202 (4th Cir. 2024). By contrast, "[d]issimilarities within the proposed class have the potential to impede the generation of common answers." Id. Individual questions predominate where "members of a proposed class will need to present evidence that varies from member to member." Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 453 (2016). "Allegations of generalized policies are not usually sufficient for the purposes of class certification." Stafford, 123 F.4th at 680.

Relatedly, with respect to typicality, "[t]o be given the trust responsibility imposed by Rule 23, a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Deiter v. Microsoft Corp., 436 F.3d 461, 466 (4th Cir. 2006). "The essence of the typicality requirement is captured by the notion that as goes the claim of the named plaintiff, so go the claims of the class." Id. A "plaintiff's claim cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of [his or her] own individual claim." Id. at 466-467.

"That is not to say that typicality requires that the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned." Id. at 467. "But when the variation in claims strikes at the heart of the respective causes of actions, [courts] have readily denied class certification." Id. Likewise, "no question of law or fact is common to class members who may lack the very claims at the heart of the plaintiffs' proposed class definitions." Mr. Dee's Inc. v. Inmar, Inc., 127 F.4th 925, 933 (4th Cir. 2025).

"Thus, it follows that the appropriate analysis of typicality must involve a comparison of the plaintiffs' claims or defenses with those of the absent class members." Deiter, 436 F.3d at 467. To conduct that analysis," the court must "review . . . the elements of plaintiffs' prima facie case and the facts on which the plaintiff would necessarily rely to prove it." Id. In a wage and hour case based upon a "theory of being worked off the clock," for example, the court must analyze "the specific uncompensated activities [class representatives] were required to perform." Stafford, 123 F.4th at 680. "Allegations of generalized policies are not usually sufficient for the purposes of class certification. Id.

B.      Analysis

Plaintiffs have not met their burden of proof on the instant renewed motion for class certification. There is a mismatch between plaintiffs' contentions in their briefs and the evidence of the actual experience of class representatives during the class period. Plaintiffs also have not shown that common issues bearing on the NCWHA claims predominate over individualized issues. Therefore, there is a lack of commonality and predominance, as well as typicality, necessary for class certification. The court addresses these deficiencies with respect to the contentions raised by plaintiffs in turn.

1.      Travel to Worksite

Plaintiffs contend defendant "failed to compensate Laborers for time spent . . . travelling within North Carolina either to and from the Goldsboro office, or to and from a North Carolina based project." (Pls' Mem. (DE 164) at 7). This generalized contention is contradicted by the evidence pertaining to Hagens and Flanagan during the class period in multiple respects, thus undermining commonality, predominance, and typicality.

11

During the class period, the record reflects that Hagens and Flanagan travelled once to a project in North Carolina, a "BluSky" project in Rockingham, and multiple times for travel within North Carolina on the way to and from projects out of state during the class period. Hagens "worked as a Crew Lead for a single day . . . [for] BluSky Restoration Contractors ('BluSky') in Rockingham, North Carolina, in April 2020." (Reese Decl. (DE 149-1) ¶ 24). Flanagan likewise worked for the BluSky project one day in April 2020. (Id. ¶ 25). According to Reese, apart from the BluSky project, plaintiff Hagens worked at no more than 21 different project locations outside the State of North Carolina, and Flanagan worked at no more than 10 different project locations outside the State of North Carolina, during the class period. (Reese Decl. 2 (DE 167-5) ¶¶ 3, 5). Plaintiffs have not presented evidence of any other projects on which Hagens and Flanagan worked in North Carolina during the class period.

In their declarations, Hagens and Flanagan assert, like the contention in plaintiffs' brief, that they were "not paid for [their] time spent travelling to the worksite location" or for return travel. (Hagens Decl. (DE 137) ¶¶ 6-7; Flanagan Decl. (DE 139) ¶¶ 5-6). These assertions are too general, however, because they are made expressly in context of transportation "to the work site locations throughout North Carolina." (Id.) (emphasis added). They are not probative to class certification because they do not differentiate between projects within the class period and those not, nor do they address the vast bulk of travel time of Hagens and Flanagan to projects outside of North Carolina.

In fact, as it pertains specifically to travel to BluSky and projects outside North Carolina, plaintiffs' contentions as to unpaid travel time are contradicted by deposition testimony of Hagens and Flanagan. Hagens states, for example, his duties included driving crew members to and from worksites, and he admits he was paid "for the drive time from Goldsboro to the worksite." (Hagens

12

Dep. (DE 174-1) 18).[9]  Flanagan also admits she was paid for travel time for multiple projects, including that she was paid travel time specifically for the BluSky project in April 2020.  (Flanagan Dep. (DE 174-2) at 112-113, 117-118).  These admissions, alone, impede commonality and typicality, but there are more hurdles.

Indeed, Hagens's and Flanagan's pay records reflect that they were paid varying amounts for travel time.  For example, Hagens's paycheck referencing BluSky shows he received "travel time" in the amount of $22.50 and $7.25, and that he received an "Advance" of $65.00, as well as a "Gas Advance Tracking" of $60.00, in the same time period.  (Hagens Dep. Ex. 6 (DE 174-1) at 131-132).[10]  He also received for the BluSky project regular pay totaling $198.00 and overtime pay totaling $148.50.  (Id. at 132; see also Hagens Dep., Ex 5 (DE 174-1 at 113)).  Flanagan received a paycheck for BluSky showing "travel time" paid at pay rates $18.12, $7.25, and $14.50, (Flanagan Dep., Ex. 5 (DE 174-2) at 107), and for other projects dated after August 2019 showing "travel time" pay, (id. at 104. 108-109).  In sum, Hagens "was paid varying amounts for travel time on at least 19 paychecks" and Flanagan "was paid varying amounts for travel time on at least 6 paychecks."  (Reese Decl. (DE 167-5) ¶¶ 3, 5).

Plaintiffs fail to demonstrate how this evidence of actual payments for travel time translates into their core NCWHA claim of completely uncompensated travel time, much less that class members' claims will "be advanced by plaintiff[s'] proof of [their] own individual claim[s]."

---

[9]  Page numbers in citations to deposition transcripts are to the page numbers showing on the face of the deposition, and not the page number supplied by the court's electronic case filing system, where some deposition transcripts have been condensed for filing four to each page.

[10]  In this respect, plaintiffs' contention that defendant "fails to reimburse North Carolina Subclass Members for transportation" expenses, and specifically Hagens's general assertion that defendant "did not reimburse for any such expenses," including "gas, toll and other transportation expenses," likewise is not supported by the evidence pertaining to class representatives.  (Pls' Mem. (DE 164) at 7; Hagens Decl. (DE 138) ¶ 17).  As such, the court finds that class representatives' claims with respect to transportation expenses are not typical and there are individualized issues that preclude a finding of commonality and predominance.

13

Deiter, 436 F.3d at 466. Rather, "the variation in claims strikes at the heart of the respective causes of actions." Id.

Under the circumstances of this case, defendant's potential NCWHA liability for each putative class member is impacted by a number of key individualized inquiries and differences. The first is whether or not the putative class member is a driver or mere passenger. Here, both Hagens and Flanagan have travel time as drivers, and one of defendant's employees at the Goldsboro office testified that drivers were all compensated for their driving time. (Flanagan Dep. Ex. 7 (DE 174-2) at 115; Radford Dep. (DE 167-3) at 24). Plaintiffs suggest nonetheless by their contentions that putative class members were not drivers, but were instead "loaded . . . into vans and dr[iven] to worksite located several hours away," and that "[a]ll Class Members traveled to project locations in the same manner." (Pls' Mem. (DE 164) at 7 (emphasis added); but see Reese Decl. (DE 149-1) ¶ 10 ("free group transportation is optional and offered as a convenience")).

A second individualized inquiry is whether or not the driving took place during work hours or outside of work hours. Here, for example, documentation of Hagens's travel time for the BluSky project indicates that the driving time took place entirely during work hours, based upon a 12:30 p.m. dispatch time, (Hagens Dep. Ex. 5 (DE 174-1) at 116), and defendant's employees state that compensation varies based upon the timing. (Radford Dep. (DE 167-3) at 24; Squires Dep. (DE 167-2) at 14-15, 19). Plaintiffs nonetheless rely upon a contrary contention that defendant "regularly dispatched crews for travel outside these designated hours [7:00 a.m. to 5:00 p.m.] resulting in unpaid travel time." (Pls' Mem. (DE 164) at 10).

A third, and related, key inquiry is what rates putative class contracted to receive for their "travel time," if different from minimum wage. A "terms of employment" form signed by plaintiff Speight has "travel time pay" left blank. (Squires Dep. Ex. 2 (DE 136-2 at 18-19)) (emphasis in

14

original).  Putting aside whether the blank was ever filled in for Speight, the form demonstrates the rate not only was variable but also could be specified separately from the regular rate of pay specified earlier in the form.  (Id.).  If the travel time rate was specified to be minimum wage, or if a greater travel time rate was not part of a putative class member's contract, then any claim based upon non-payment of minimum wage would be preempted by the FLSA, and not a viable component of an NCWHA claim.  See, e.g., Speight, 2024 WL 4267914, at *5 (noting NCWHA claim "must be separate and distinct from the plaintiff's FLSA minimum wage and overtime claims").  In other instances, it would be necessary to conduct an individual inquiry into what rate, if any, was specified and whether the amounts actually paid (as in the case of Hagens and Flanagan) did not match the contracted travel time rate.[11]

In sum, there is insufficient evidence linking the "generalized policies" alleged by plaintiffs in their briefs and declarations regarding uncompensated travel time with the "specific uncompensated activities [Hagens and Flanagan] were required to perform" during the class period.  Stafford, 123 F.4th at 680.  Plaintiffs seek class certification based on generalizations about defendant's travel time policies, (see Pls' Mem. (DE 164) at 9-10, 24-25; Reply (DE 168) at 8), without tying them to actual experiences of plaintiffs Hagens and Flanagan during the class period.  Varied circumstances for each paycheck and each out-of-state project underscore the individualized evidence that will be necessary to determine whether travel time paid was or was not sufficient under the NCWHA.

---

[11]    Moreover, for claims premised upon any allegedly unpaid travel time worked by plaintiff Hagens on the BluSky project, such claims are exempted overtime claims, for the reasons set forth in more detail below with respect to the Crew Lead Subclass Members claims, because Hagens already worked and was compensated for more than 40 hours that week.

In sum, plaintiffs have failed to demonstrate class certification is appropriate with respect to their claim under the NCWHA that defendant required that they travel within North Carolina during the class period without pay.

2.  Travel Between Hotel and Worksite

Plaintiffs contend that defendant "did not pay Laborers for time spent traveling to and from the work sites and the hotel."  (Pls' Mem. (DE 164) at 7).  Plaintiffs assert that "a hotel of [defendant's] choosing . . . was often an hour or more away from the job site." (Id. at 11).  Plaintiff Hagens also asserts generally in his declaration that "[i]t would take approximately 1 1/2 – 2 hours to get to the worksite."  (Hagens Decl. (DE 137) ¶ 10).  Plaintiff Flanagan further states "it would take approximately 60 minutes to get to the worksite."  (Flanagan Decl. (DE 139) ¶ 8).

These contentions are an insufficient basis for class certification for several reasons.  As an initial matter, there is again a mismatch between plaintiffs' generalized contentions and the actual experience of Hagens and Flanagan on the only project within North Carolina during the class period, the BluSky project in Rockingham.  The record reflects that, for the BluSky project in April 2020, Hagens was one of 12 workers who stayed at the "Days Inn," "408 W. Broad Ave., Rockingham, NC 28379."  (Hagens Dep. Ex. 5 (DE 174-1) at 112).  In turn, the "jobsite address" for the BluSky project was "463 Long Dr. Rockingham, NC 28379." (Id. at 111; Flanagan Dep. Ex. 4 (DE 174-2) at 103).  The court thus readily can take judicial notice that the project site was less than three miles from the hotel, with no indication that such a trip would take more than 30 minutes.  There is, furthermore, no evidence regarding what hotel, if any, Flanagan used for the BluSky project.  (See Flanagan Dep. Ex. 5 (DE 174-2) at 109; Flanagan Dep. 95-98).

The difference between plaintiffs' contentions and the actual experience of Hagens and Flanagan regarding timing is critical to determination of defendant's liability for time spent

traveling between hotel and worksite. Under Department of Labor regulations, "[n]ormal travel from home to work is not worktime." 29 C.F.R. § 785.35. Thus, it is relevant to the class certification analysis that some putative class members have alleged hotel-project travel times of one, two, or three or more hours, (e.g., Hinojosa Decl. (DE 143) ¶¶ 5-8), which may not qualify as "normal travel from home to work," 29 C.F.R. § 785.35, while according to the evidence in the record, Hagens and Flanagan did not experience such an extended commute in Rockingham.

Moreover, plaintiffs have not demonstrated common issues predominate over individual issues regarding the terms of payment of commuting time. For example, defendant's "terms of employment" form in the record states: "I understand and agree that any time commuting to or from a work site (whether [defendant] transports me or I have my own transportation) will not be paid unless [defendant] expressly agrees to such pay in writing." (Squires Dep. Ex. 2 (DE 136-2) at 19) (emphasis in original). This example suggests there is no common proof establishing a claim under the NCWHA for failure to pay "regular wages" for commuting time, where such payment was dependent upon an express agreement that is not in the record.

In sum, class representatives' claims are not typical of absent class members' claims, and the claims may be dependent upon an individualized determination of the terms and length of time of the commute.

On the basis of the foregoing alone, plaintiffs' renewed certification motion must be denied, because plaintiffs have not demonstrated commonality, predominance, and typicality, regarding the core contentions about travel time at the heart of the class definition on which the court authorized plaintiffs to seek renewed certification. See Mr. Dee's Inc., 127 F.4th at 933 ("[N]o question of law or fact is common to class members who may lack the very claims at the heart of the plaintiffs' proposed class definitions."). Plaintiffs nonetheless continue to advance

other contentions asserted in support of their prior proposed class definitions. These further contentions are beyond the scope of the court's order granting leave to plaintiffs to file a renewed class certification based upon the definition proposed in their reconsideration motion. Nevertheless, the court considers them in turn as follows, where they further illustrate a lack of commonality, predominance, and typicality, with respect to class certification of plaintiffs' NCWHA claims.

### 3. Onboarding/Orientation/Training

Plaintiffs contend that defendant "failed to compensate Laborers for time spent during the initial on-boarding and orientation in Goldsboro, North Carolina, prior to dispatch," and "Class Members were recruited and met [at] a central office (e.g., Goldsboro) from which they were dispatched to the job site after receiving orientation and training about the job." (Pls' Mem. (DE 164) at 7). This contention is an insufficient basis for class certification because plaintiffs have not demonstrated that class representatives' experiences during the class period were typical of other putative class members, nor that class members were subject to a common policy with respect to onboarding, orientation, and training that gives rises to non-exempted claims under the NCWHA.

As an initial matter, the evidence regarding onboarding, orientation, and training, of Hagens and Flanagan during the class period is lacking. Hagens testified he did not have meetings in the Goldsboro office as described in plaintiffs' contentions. (Hagens Dep. (DE 174-1) 49-50; see Hagens Decl. (DE 137)). Flanagan described an initial orientation in 2019 – outside of the class period – where she "looked at a video" in the Goldsboro office. (Flanagan Dep. (DE 174-2) at 73; see Flanagan Decl. (DE 139)). There is thus an absence of typicality.

Likewise, there is insufficient evidence of a common policy regarding onboarding, orientation, and training. Reese testified as to practices in a prior "Murphy case" where he "indicated there was generally a meeting with the crew before they left to travel to the worksite." (Reese Dep. (DE 149-7) at 102). This is not probative of what took place for Hagens and Flanagan on the BluSky project nor what took place when they traveled to out-of-state projects during the class period.

Thus, plaintiffs' have not demonstrated typicality nor commonality with respect to plaintiffs' NCWHA claims based upon onboarding, orientation, and training time.

4. Pre- and Post-Shift Duties

Plaintiffs contend defendant did not "pay for time spent by North Carolina Subclass Members performing pre-shift duties at work sites, where they were required to arrive early and their pre-shift work was not tracked." (Pls' Mem. (DE 164) at 7). Plaintiffs also contend defendant failed to compensate Crew Leads for time spent "checking the crews in and out of hotels, organizing the crews each day for departure from the hotel, organizing and setting up the crew at the job site before scheduled work begins, reporting to [defendant] the events of each day's work and submitting various administrative paperwork." (Id. at 7-8).

As with plaintiffs' contentions concerning orientation and training, the evidence pertaining to the class period shows that such practices were not uniform, and too varied, individualized, and project specific, to meet the rigorous predominance and typicality requirements of Rule 23.

For example, with respect to pre-shift duties at the job site, Flanagan asserts in her declaration "[e]ach day, we arrived at the worksite approximately 15 minutes, as instructed by [defendant] before the scheduled start time." (Id. ¶ 11). "During this time, we would set up our equipment, meet with client representatives and made sure everyone had their PPE [personal

19

protective equipment] to get started for the day," which time was not paid.  (Id.).  By contrast, however, Hagens testified that time spent putting on PPE would be after arriving at the worksite, working, and being "sign[ed] in."  (Hagens Dep. (DE 174-1) 56).  Other putative class members also testified that putting on PPE and safety meetings took place after they were "on the clock." (Achane Dep. (DE 149-9) at 54; Cruz Dep. (DE 149-8) at 63).  Further testimony by putative class members shows significant variation in pre-shift activities, by individual, project roles, and project dates and locations.  (See, e.g., Owens Decl. (DE 145) ¶ 11, Maye Decl. (DE 144), Hinojosa Decl. (DE 143), Gardner Decl. (DE 142) ¶ 8), Speight Decl (DE 140)).

Flanagan also asserts that "[w]hile driving [to project worksites], we would reiterate the project we were about to do that day and the amount of time required to spend on the project." (Flanagan Decl. (DE 139) ¶ 8).  Hagens also asserts "[d]uring the drive we would discuss work-related issues like how we would staff the work  and the work to be performed," and "[w]hile driving back to the hotel, my team and I discussed the work performed and what the next day entailed."  (Hagens Decl. (DE 137) ¶¶ 10-11).  These assertions, however, relate to a drive of "1 1/2 – 2 hours to get to the worksite," and they are thus irrelevant as evidence concerning the BluSky project.  (Id.).  Flanagan also asserts "[e]very day all the laborers would meet at the hotel parking lot around 6am in the morning," (id. ¶ 8), but there is no evidence Flanagan stayed at a hotel for the BluSky project.

With respect to plaintiffs' contentions regarding Crew Leads, there are also hurdles that arise due to the limitations of the class period, such that the only relevant evidence is what took place for Hagens on the BluSky project, compared to what took place outside the class period or for other absent class members.  For example, Hagens asserts generally in his declaration that, as crew lead, he "had to spend 30-60 minutes every day making sure [his crew] were all ready to

leave on time each morning, and ready to depart each evening," and he would use the drive time to the project to "discuss work-related issues like how we would staff the work and the work to be performed." (Hagens Decl. ¶¶ 8, 10). Further, "it was [his] responsibility to fill out the sign in sheet for all the laborer[s] in [his] crew," and he "was instructed by [defendant] that [his] timesheet had to match that of the Client on the project and if there was a discrepancy to adjust my time to match that of the Client, even if it meant inaccurately recording the hours worked by the laborers." (Id. ¶ 15). However, with respect to the BluSky project, specifically, Hagens testified the hours that were listed on the time sheet he personally filled out were "accurate hours in terms of what [he] and [his] crew members worked that day." (Hagens Dep. (DE 174-1) at 76; Hagens Dep. Ex. 5 (DE 174-1) at 111). This discrepancy impedes a commonality and typicality determination.

In addition, and in the alternative, with respect to the Crew Lead Subclass, plaintiffs' contentions are precluded by the NCWHA exemption for overtime claims. In particular, Hagens asserts he "worked more than 40 hours per week virtually every week," and he "and the other workers on [his] crew, would regularly work upwards of 70-90 hours per week, not including the time spent driving to and from the hotel." (Hagens Decl. (DE 137) ¶ 3). Most critically, with respect to the BluSky project, Hagens's actual paycheck shows he already received 5.5 hours of overtime pay for work on the project:

21

| Employee Name: | Hagens, Jason | | Gross Amount: | | $376.25 | | Is DD: Y | |
|---|---|---|---|---|---|---|---|---|
| SSN: | REDACTED | | Total Taxes: | | $46.57 | | | |
| Check Number: | 5052315 | | Total Deductions: | | $65.00 | | | |
| Check Date: | 04/09/20 | | Net Check: | | $264.68 | | | |

| Week Worked | Customer – Department | | Type | Units | Pay Rate | Total Pay |
|---|---|---|---|---|---|---|
| 3/30/2020 – 4/5/2020 | BLUSKY RESTORATION – Corporate | | Reg | 7.50 | $18.00 | $135.00 |
| 3/30/2020 – 4/5/2020 | BLUSKY RESTORATION – Corporate | | Reg | 3.50 | $18.00 | $63.00 |
| 3/30/2020 – 4/5/2020 | BLUSKY RESTORATION – Corporate | | OT | 5.50 | $27.00 | $148.50 |
| 3/30/2020 – 4/5/2020 | BLUSKY RESTORATION – Corporate | | TRAVEL TIME | 1.00 | $22.50 | $22.50 |
| 3/30/2020 – 4/5/2020 | BLUSKY RESTORATION – Corporate | | TRAVEL TIME | 1.00 | $7.25 | $7.25 |

| Tax Name | Taxable Gross | Tax Amount | Deduction Type | Amount | Benefit Type | Amount |
|---|---|---|---|---|---|---|
| Federal Income Tax | $376.25 | $13.78 | Advance Pay Back | $65.00 | | |
| FICA EE | $376.25 | $23.33 | | | | |
| MED EE | $376.25 | $5.46 | | | | |
| NC WH | $376.25 | $4.00 | | | | |

| Bank Name | Acc Type | Routing # | Account # | Amount | Accrual Plan | Acc Units | Dep Units | Balance |
|---|---|---|---|---|---|---|---|---|
| rapid! PayCard | rapid! PayCard | REDACTED | | $264.68 | | | | |

(Hagens Dep. Ex. 5 (DE 174-1) at 132). Hagens's paychecks for other projects worked that week (out-of-state) further show that he worked and was compensated for more than a total of 40 hours that week. (See id. at 132-133) (9 hours on "ServPro," plus 21 hours on "All Risk," and 18.5 hours on BluSky, totaling 47.5 hours for the week).

Therefore, any claim for additional time that allegedly was uncompensated for Hagens, such as the pre- and post-shift work time that forms the basis for plaintiff Hagens' NCWHA claim, necessarily is a claim for overtime compensation. As such, his sole Crew Lead Subclass representative claim within the class period expressly is exempted under the NCWHA, and it is not a viable independent claim under the NCWHA. See N.C. Gen. Stat. § 95-25.4 (overtime provision); § 95-25.14 (exemption); Speight v. Lab. Source, LLC, No. 4:21-CV-112, 2024 WL 4267914, at *5 (E.D.N.C. Sept. 23, 2024) ("Plaintiff's NCWHA claim may proceed to the extent it seeks unpaid, earned, compensation apart from overtime pay.") (emphasis added); see id. (noting state law wage and hour claims are available to "an employee who has worked no overtime") (quoting Monahan v. Cnty of Chesterfield Va., 95 F.3d 1263, 1265 (4th Cir. 1996)).

Where plaintiff Hagens lacks a viable independent claim under the NCWHA, based on these contentions, he cannot serve as the sole class representative for the Crew Lead Subclass, and certification of this subclass necessarily must be denied on this alternative basis.  See East Texas Motor Freight Sys. Inc. v. Rodriguez, 431 U.S. 395, 403 (1977) (holding plaintiffs were "not proper class representatives" because their individual claims were without merit); Deiter, 436 F.3d at 466 ("The essence of the typicality requirement is captured by the notion that as goes the claim of the named plaintiff, so go the claims of the class").

Plaintiffs argue that this case is similar to Zelaya v. A+ Tires, Brakes, Lubes, & Mufflers, Inc., No. 5:13-CV-810-F, 2015 WL 5703569, at *4 (E.D.N.C. Sept. 28, 2015), where this court granted class certification of NCWHA claims based upon uncompensated pre- and post-shift work, travel time, and failure to record hours worked.  Zelaya, however, is inapposite because it applied a different standard for class certification.  In particular, the court determined that "allegations of similar employment practices alone are sufficient to satisfy the commonality and typicality requirements."  Id. at * 4 (emphasis in original).  However, the Fourth Circuit recently has emphasized, to the contrary, that "Rule 23 holds plaintiffs to a higher bar than a pleading standard." Stafford, 123 F.4th at 679.  The moving "party must present evidence that the putative class complies with Rule 23."  EQT Prod. Co., 764 F.3d at 357.  Moreover, the court in Zelaya did not address any arguments raised by the defendant in that case as to class certification, much less the critical issues raised here, that class representatives' experiences are not typical of absent class members and that there is a predominance of individual variations material to the claims.

Plaintiffs also suggest that the issues of individual proof raised by defendant are merely questions of damages that are "not a barrier to class certification."  (Reply (DE 168) at 4).  They contend that the issue of "whether Defendant's compensation practices were unlawful . . . is a

23

question to be raised (but not answered) now, at the class certification stage." (Id.). They also state that "each plaintiff's uncompensated working hours need only be multiplied by the regular wage rate for the class member's position." (Id.). These suggestions are without merit under the circumstances of this case for two reasons.

First, "a court should consider merits questions to the extent they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." EQT Prod. Co., 764 F.3d at 358. This is precisely what the court did in its prior order, where merits issues of time and geographical limitations precluded class certification, and what the court must do in the instant order, where plaintiffs have failed to demonstrate that class representatives' viable claims, if any, are typical of absent class members' claims and that common issues bearing on defendant's liability predominate over individual issues. Second, and relatedly, it is not accurate to state that "each plaintiff's uncompensated working hours need only be multiplied by the regular wage," (Reply (DE 168) at 4), given that many class members received overtime wages, under the FLSA, in a particular workweek, and given that allegedly uncompensated time is based upon a variety of disparate circumstances and activities. See Stafford, 123 F.4th at 680 (rejecting a class certification analysis that relies solely on the allegation that class members "are unified by a common theory of being worked off the clock, regardless of the specific uncompensated activities they were required to perform"). As in Stafford, "[a]ll these activities whether pre-shift, workday, or post-closing, . . . raise distinct questions," precluding a commonality, predominance, and typicality determination. Id.

Therefore, given that plaintiffs have failed to demonstrate commonality, predominance, and typicality, with respect to their NCWHA claims, class certification must be denied. Where

class certification must be denied on this basis, the court does not reach remaining requirements of ascertainability, numerosity, adequacy, or superiority.

C.      Case Scheduling

Under the terms of the court's December 21, 2021, case management order, and May 19, 2022, amended case management order, the court directs the parties to file a join report, within 14 days of the date of this order, that proposes limits and deadlines for any remaining merits-based discovery, including deadlines for expert discovery, completion of all discovery, and dispositive motions. Thereupon the court will enter such further order that is warranted regarding case scheduling.

## CONCLUSION

Based on the foregoing, plaintiffs' renewed motion to certify class (DE 163) is DENIED. The parties are DIRECTED to file, within 14 days of the date of this order, a joint status report regarding case scheduling, as set forth herein.

SO ORDERED, this the 24th day of March, 2025.

LOUISE W. FLANAGAN
United States District Judge